UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

TANIEKA L. HARRIS,                    )   NO. EDCV 09-199 SS
                                      )
                    Plaintiff,        )
                                      )   **MEMORANDUM DECISION AND ORDER**
         v.                           )
                                      )
MICHAEL J. ASTRUE,                    )
Commissioner of the Social            )
Security Administration,              )
                                      )
                    Defendant.        )
_____)

**I.**

**INTRODUCTION**

Tanieka L. Harris ("Plaintiff") brings this action seeking to overturn the decision of the Commissioner of the Social Security Administration (hereinafter the "Commissioner" or the "Agency") denying her applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). The parties consented, pursuant to 28 U.S.C. § 636(c), to the jurisdiction of the undersigned United States Magistrate Judge. For the reasons stated below, the decision of the Commissioner is REVERSED and the action is remanded for further proceedings consistent with this decision.

## II.

### PROCEDURAL HISTORY

Plaintiff protectively filed applications for SSI and DIB on May 30, 2006.  (Administrative Record ("AR") 8, 34-37, 99-101, 103).[1]  She alleged a disability onset date of October 1, 2005 (AR 8, 125) due to asthma, headaches, seizures, and side effects from a stroke.  (AR 125). The Agency denied Plaintiff's claims for SSI and DIB initially on December 28, 2006.  (AR 8, 38-42).   This denial was upheld upon reconsideration on April 26, 2007.  (AR 8, 44-48).

On August 13, 2008, a hearing was held before Administrative Law Judge ("ALJ") Joseph D. Schloss.[2]  (AR 18-27).  The ALJ denied benefits in a written decision dated October 3, 2008.  (AR 5-16).  On October 10, 2008, Plaintiff sought review of the unfavorable decision.  (AR 4).  The Appeals Council declined review on December 11, 2008.  (AR 1-3). Plaintiff commenced the instant action on February 4, 2009.

///

///

///

///

_____

[1]  Plaintiff previously filed an application for disability benefits in 2004, which was denied.  (AR 26).

[2]  The ALJ held a prior hearing on June 26, 2008.  (AR 28-33).  It was continued after Plaintiff informed the ALJ that she had hired an attorney to represent her.  (Id.).

2

### III.

### FACTUAL BACKGROUND

**A.    Generally**

Plaintiff was born on May 30, 1972, and was 36 years old at the time of the hearing. (AR 18, 99, 392). She has three years of college education and past relevant work experience as a rural route carrier. (AR 126, 129).

**B.    Relevant Medical History**

**1.    Treating Physicians**

On September 19, 2000, Plaintiff presented at a Kaiser Permanente clinic with complaints of headaches. (AR 281). She reported that she had taken Vicodin earlier at home but that it did not relieve her pain. (Id.). Dr. Sugimoto noted that a recent MRI of Plaintiff's brain was normal. (Id.). Dr. Sugimoto diagnosed Plaintiff with migraine headaches and prescribed Stadol and Phenergan. (Id.).

On August 19, 2002, Dr. John Sharpe, Plaintiff's primary care physician, treated Plaintiff for complaints of wheezing at night. (AR 327). He diagnosed sinusitis and asthma. (Id.).

On January 8, 2003, Plaintiff presented with complaints of difficulty speaking (i.e., stuttering), headaches on the left side of the head, weakness in the left extremities, and numbness in the left

3

face, arm, and leg.  (AR 336).   An MRI of the brain and physical and neurological examinations were all normal.  (AR 337-39, 341-42).   Dr. Thomas Miller, a neurologist, commented that Plaintiff had "suggestion of medication rebound-type headache" and symptoms suggesting a migraine with impaired speech and paresthesia.  (AR 341).   He opined that Plaintiff should limit her narcotic analgesic medications.  (AR 341-42).

On January 17, 2003, Plaintiff reported that her headaches were frequent and that she could not talk properly.  (AR 343).   Dr. Miller referred Plaintiff for a speech therapy evaluation.  (Id.).   On June 4, 2003, Dr. Viera Striez, a speech and language pathologist, observed that Plaintiff's scores from the Stuttering Severity Instrument examination suggested a "moderate degree of stuttering."  (AR 347).   Dr. Striez also noted that Plaintiff had severe facial dystonia, eye blinking, and involuntary facial and throat muscle ticks and twitches during reading and spontaneous speech.  (Id.).   Dr. Striez recommended that Dr. Miller conduct further evaluation to determine the underlying cause of Plaintiff's facial dystonia and speech dysfluencies.  (Id.).   On June 11, 2003, Dr. Miller noted that Plaintiff was speaking "better" and that she did "better when she speaks slowly."  (AR 348).

On September 8, 2003, Dr. Sharpe referred Plaintiff to Dr. Francisco Torres for neurology consultation.  (AR 362).   Plaintiff complained of stuttering and chronic headaches.  (Id.).   Dr. Torres noted that Plaintiff's neurologic examination was normal but that, at times, Plaintiff's speech had a "stuttering quality to it" and that she suffered from a "chronic headache problem."  (AR 366).

4

On September 12, 2003, Dr. Sharpe referred Plaintiff to Dr. Joey Gee for another neurology consultation. (AR 364). Dr. Gee opined that Plaintiff's headaches were "consistent with migraine without aura" and that she had "lots of features in the initial headache secondary to medication overuse." (AR 365). Dr. Gee observed that Plaintiff's headaches transformed into "a daily continued, daily phenomenon headache." (Id.). Dr. Gee recommended that Plaintiff discontinue the use of Robaxin, Flexeril, Propranolol, Elavil, Reglan. (Id.). He further recommended that Plaintiff "taper down" the use of Ambien and "significantly cut down" the use of Vicodin. (Id.). Dr. Gee commented that he hoped that Plaintiff would eventually stop using Vicodin. (Id.). He then prescribed Depakote and Nortriptyline. (Id.). On October 8, 2003, however, Plaintiff reported that she had taken five Vicodin pills that day. (AR 377).

On February 20, 2004, Dr. Gee noted that Plaintiff was still receiving Vicodin and Darvocet. (AR 399). He commented that he wanted Plaintiff to completely discontinue the use of narcotic medications, "as this is only worsening her headache overall, causing rebound." (Id.). Dr. Gee "highly recommended" that Dr. Sharpe "withhold any further prescriptions of the narcotics medications." (Id.). He administered a series of botulinum injections over the course of the next several months to relieve Plaintiff's headaches. (AR 399, 401, 412, 414-17, 421, 423, 426-27).

On April 16, 2004, Plaintiff reported that she suffered a syncopal episode and injured her head and lower back. (AR 402, 406). A CT scan

5

of the brain and x-rays of the back were negative.  (AR 405, 408).  Dr. Pierre Assaf prescribed Vicodin and discharged Plaintiff.  (AR 407).

On June 1, 2004, Dr. Gee discontinued Plaintiff's Depakote medication and prescribed Topiramate.  (AR 412).  He commented that Plaintiff was using an excessive amount of Acetaminophen and Excedrin and advised her to discontinue them "at all costs."  (Id.).

On July 14, 2004, Plaintiff again complained of severe headaches. (AR 413).  She noted that she could not tolerate Topiramate because of her history of "borderline glaucoma on a previous trial."  (Id.).  Dr. Gee discontinued Plaintiff's Topiramate medication and prescribed Indomethacin.  (Id.).  He commented:

> I do feel that we are on the brink of stating that [Plaintiff] may be one of these patients who just do not respond to any available medication that we have tried.  This patient may have to be placed on chronic long term analgesic medications such as a longer acting opiate compounds just to control her headache.

(Id.).

On August 30, 2004, Dr. Gee noted that Plaintiff was "very difficult" to treat because she had been unable to tolerate many medications.  (AR 414).  On April 6, 2005, Plaintiff complained of experiencing a syncopal episode.  (AR 223).  An echocardiogram revealed mild mitral valve prolapse changes with minimal to mild regurgitation

and mild tricuspid valve regurgitation changes.  (AR 239-40).  An EEG and a CT of the head were normal.  (AR 241-44).

On May 5, 2005, Plaintiff reported that she had experienced four blackouts since discontinuing Topiramate.  (AR 418).  She noted that she did not have any blackouts when she was on Topiramate.  (<u>Id.</u>).  Dr. Gee noted that an EEG and CT of the head were both normal.  (<u>Id.</u>).  Although Plaintiff noted that she experienced vision problems with Topiramate, she was willing to go back on the medication.  (<u>Id.</u>).  Dr. Gee represcribed Topiramate at a lower dose.  (<u>Id.</u>).

An MRI of the brain taken on August 2, 2005 was unremarkable.  (AR 428).  On September 9, 2005, Plaintiff complained of eye irritation and burning.  (AR 420).  On January 30, 2006, Plaintiff complained of insomnia, depression, anxiety, and frequent headaches.  (AR 424).  Dr. Gee prescribed Effexor.

On September 12, 2006, Plaintiff complained of headaches.  (AR 475).  Dr. Sharpe observed that there were no focal deficits.  (<u>Id.</u>).  He noted that Plaintiff was still taking narcotic pain medication such as OxyContin and Vicodin.  (<u>Id.</u>).  Dr. Sharpe prescribed Toradol.  (<u>Id.</u>).  On November 13, 2006, Dr. Gee noted that Plaintiff was tolerating Topiramate.  (AR 465).

On December 15, 2006, Dr. Sharpe noted that an individual named Reggie Jones, who purported to be Plaintiff's husband, called to tell him that Plaintiff was selling her OxyContin pills.  (AR 464).  Plaintiff denied that she sold her medication or that Jones was her

husband. (<u>Id.</u>). Dr. Sharpe assessed migraine headaches and refilled Plaintiff's prescription for OxyContin. (<u>Id.</u>).

On January 23, 2007, Dr. Gee noted that Plaintiff "has maximized her current treatment option and is as stable as she is going to be in regard to her chronic migraine and epilepsy." (AR 505). Dr. Gee opined that Plaintiff was not adequate to perform any significant job duties. (<u>Id.</u>). He indicated that he would continue to treat Plaintiff with Topiramate and Botulinum injections. (<u>Id.</u>).

On September 2, 2008, Dr. Sharpe submitted a letter indicating that Plaintiff had "chronic migraines and . . . continuous headaches 24 hours a day, 7 days a week, with exacerbations that are disabling." (AR 504). He also noted that Plaintiff had "epilepsy (a seizure disorder)." (<u>Id.</u>). Dr. Sharped concluded that Plaintiff "may be able to sit, stand, or walk from 5 minutes to 1 hour" and could not be employed "in any type of work due to the severity of her constant headaches." (<u>Id.</u>).

**2.   Consultative Examining Physicians**

On December 8, 2004, Dr. Gabriel Fabella conducted an internal medicine evaluation of Plaintiff. (AR 202-07). Plaintiff complained of headaches and asthma. (AR 202). Plaintiff stated that she passed out in January 2002. (<u>Id.</u>). Plaintiff stated that she had to have speech therapy and learn how to read again. (<u>Id.</u>). She reported that her asthma was well controlled. Plaintiff noted that her asthma attacks occurred only once a month and were relieved by an inhaler. (<u>Id.</u>).

8

Dr. Fabella noted that Plaintiff's physical examination was unremarkable except for her speech. (AR 204-06). Specifically, he observed that Plaintiff "spoke very slowly as if she was mentally slow and grouping for words." (AR 202). Dr. Fabella opined that Plaintiff's only limitations were that she should avoid temperature extremes, dusts, fumes, and strong chemicals due to her asthma. (AR 206).

On December 8, 2004, Dr. Louis Fontana performed a psychiatric evaluation of Plaintiff. (AR 208-12). Plaintiff complained that he had "[p]roblems with depression since [her] stroke." (AR 208). She reported that on January 6, 2002, she was taken to a hospital after having a severe headache. (AR 209). Plaintiff noted that she has never had any definitive diagnosis of a stroke but has had problems with speech since the incident. (Id.). She asserted that she had to relearn how to read. (Id.). Plaintiff reported that she stopped working in 2000, after she suffered her possible stroke. (AR 210).

After conducting a mental status examination, Dr. Fontana diagnosed Plaintiff with adjustment disorder with depressed mood. (AR 210-11). He opined that Plaintiff should be able to: perform "simple and repetitive tasks, as well as more detailed and complex tasks"; accept instructions from supervisors; interact appropriately with coworkers and the public; perform work activities on a consistent basis, without additional supervision; maintain regular attendance in the workplace; and complete a normal workday/workweek. (AR 211).

On February 11, 2006, Dr. Jason Yang conducted another psychiatric evaluation of Plaintiff. (AR 434-37). Plaintiff complained of

depression and anxiety for the past several years. (AR 434). She stated that she also suffered from severe headaches. (Id.). Plaintiff reported that she last worked in 2003. (AR 436). Dr. Yang noted that a mental status examination revealed no evidence of cognitive deficits, perceptual disturbances, or delusional disorders. (AR 436-37). He diagnosed Plaintiff with depressive disorder, not otherwise specified. (AR 436). Dr. Yang opined that Plaintiff should be able to: adequately remember and complete simple and complex tasks; tolerate the stress inherent in the work environment; maintain regular attendance; work without supervision; and interact appropriately with supervisors, coworkers, and the public. (AR 437).

### 3. Medical Experts

At the hearing, Dr. DeBolt testified that, based on his review of the medical records, Plaintiff did not have any severe medically determinable impairment. (AR 21). In particular, he stated that there were no objective findings to support any neurological impairment or diagnosis related to Plaintiff's headaches. (AR 21-22). Dr. DeBolt also testified that the medical records did not demonstrated that Plaintiff ever suffered a seizure or stroke. (AR 21-25). He stated that the medical evidence did not reflect any need for Plaintiff to take OxyContin. (AR 22). Dr. DeBolt also indicated that there was evidence of stuttering, which he believed was caused by nervousness and not by an organic disease of the brain. (AR 25).

**C.   Third Party Letters**

In an anonymous letter dated August 7, 2006, a person reported that Plaintiff was committing social security disability fraud by underreporting her assets.   (AR 95).   The person explained that Plaintiff owned a house and two cars, which were registered under her mother's name.   (Id.).   The person also reported that Plaintiff was selling her OxyContin and Vicodin pills.   (Id.).

In another anonymous letter dated June 25, 2007, a person reported that Plaintiff was committing social security disability fraud.   (AR 96).   The person noted that, despite Plaintiff's claim of inability to work due to illness, she worked for a company named Tiny Tours.   (Id.). The person also stated that Plaintiff had been selling her OxyContin and Vicodin pills and had applied for county aid.   (Id.).   In support of the letter, the person submitted a copy of a May 1, 2007 check in the amount of $632 from Tiny Tours made payable to Plaintiff.   (AR 98).   The person also submitted a copy of a Disability Benefit Activation Form signed by Plaintiff on April 10, 2007 and by her treating physician, Dr. Gee, on April 19, 2007.   (AR 97).   On the form, Plaintiff reported that she last worked on March 13, 2007, and both she and Dr. Gee reported that she became disabled on March 16, 2007.   (Id.).

Another anonymous letter, which is undated, states that the prior anonymous letter(s) was written by family members who were bent on destroying Plaintiff's life.   (AR 503).

11

# IV.

## THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents him from engaging in substantial gainful activity[3] and that is expected to result in death or to last for a continuous period of at least twelve months. Reddick v. Chater, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)). The impairment must render the claimant incapable of performing the work he previously performed and incapable of performing any other substantial gainful employment that exists in the national economy. Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry. 20 C.F.R. §§ 404.1520, 416.920. The steps are as follows:

(1) Is the claimant presently engaged in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.

(2) Is the claimant's impairment severe? If not, the claimant is found not disabled. If so, proceed to step three.

---

[3] Substantial gainful activity means work that involves doing significant and productive physical or mental duties and is done for pay or profit. 20 C.F.R. §§ 404.1510, 416.910.

(3)   Does the claimant's impairment meet or equal one of a list of specific impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1?   If so, the claimant is found disabled.   If not, proceed to step four.

(4)   Is the claimant capable of performing her past work?   If so, the claimant is found not disabled.   If not, proceed to step five.

(5)   Is the claimant able to do any other work?   If not, the claimant is found disabled.   If so, the claimant is found not disabled.

Tackett, 180 F.3d at 1098-99; see also 20 C.F.R. §§ 404.1520(b)-(g)(1), 416.920(b)-(g)(1); Bustamante v. Massanari, 262 F.3d 949, 953-54 (9th Cir. 2001) (citations omitted).

The claimant has the burden of proof at steps one through four, and the Commissioner has the burden of proof at step five.   Bustamante, 262 F.3d at 953-54.   If, at step four, the claimant meets his burden of establishing an inability to perform past work, the Commissioner must show that the claimant can perform some other work that exists in "significant numbers" in the national economy, taking into account the claimant's residual functional capacity ("RFC"),[4] age, education, and

_____

[4]   Residual functional capacity is "the most [one] can still do despite [one's] limitations" and represents an assessment "based on all the relevant evidence in [one's] case record."   20 C.F.R. §§ 404.1545(a), 416.945(a).

13

work experience.  <u>Tackett</u>, 180 F.3d at 1098, 1100; <u>Reddick</u>, 157 F.3d at 721; 20 C.F.R. §§ 404.1520(g)(1), 416.920(g)(1).  The Commissioner may do so by the testimony of a vocational expert or by reference to the Medical-Vocational Guidelines appearing in 20 C.F.R. Part 404, Subpart P, Appendix 2 (commonly known as "the Grids").  <u>Osenbrock v. Apfel</u>, 240 F.3d 1157, 1162 (9th Cir. 2001).  When a claimant has both exertional (strength-related) and nonexertional limitations, the Grids are inapplicable and the ALJ must take the testimony of a VE.  <u>Moore v. Apfel</u>, 216 F.3d 864, 869 (9th Cir. 2000).

**V.**

**THE ALJ'S DECISION**

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date. (AR 10).

At step two, the ALJ determined that Plaintiff had medically determinable impairments of headaches and asthma.  (<u>Id.</u>).  However, he found that Plaintiff's impairments were not severe.  (<u>Id.</u>).  Therefore, the ALJ concluded that Plaintiff was not disabled at any time through the date of the decision.  (AR 16).

**VI.**

**STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  The court may set aside the

14

1    Commissioner's decision when the ALJ's findings are based on legal error

2    or are not supported by substantial evidence in the record as a whole.

3    Aukland v. Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001); Smolen v.

4    Chater, 80 F.3d 1273, 1279 (9th Cir. 1996).

5

6        "Substantial evidence is more than a scintilla, but less than a

7    preponderance." Reddick, 157 F.3d at 720. It is "relevant evidence

8    which a reasonable person might accept as adequate to support a

9    conclusion." Id. To determine whether substantial evidence supports

10   a finding, the court must "'consider the record as a whole, weighing

11   both evidence that supports and evidence that detracts from the

12   [Commissioner's] conclusion.'" Aukland, 257 F.3d at 1035 (quoting Penny

13   v. Sullivan, 2 F.3d 953, 956 (9th Cir. 1993)). If the evidence can

14   reasonably support either affirming or reversing that conclusion, the

15   court may not substitute its judgment for that of the Commissioner.

16   Reddick, 157 F.3d at 720-21.

17   \\

18   \\

19   \\

20   \\

21   \\

22   \\

23   \\

24   \\

25   \\

26   \\

27   \\

28   \\

15

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**VII.**

**DISCUSSION**

**The ALJ's Finding That Plaintiff's Headaches Were Not Severe At Step Two Was Error**

Plaintiff argues that the ALJ improperly found that Plaintiff's headaches and asthma were not severe.[5] (Jt. Stip. at 18-21). The evidence demonstrates that Plaintiff satisfies the very low standard for a step-two finding of severity as to her headaches, but not her asthma. The Court remands this action for reevaluation of Plaintiff's claim based upon her headaches after step-two.

By its own terms, the evaluation at step two is a de minimis test intended to weed out the most minor of impairments. See Bowen v. Yuckert, 482 U.S. 137, 153-154, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987); Edlund v. Massanari, 253 F.3d 1152, 1158 (9th Cir. 2001) (stating that the step two inquiry is a de minimis screening device to dispose of groundless claims) (quoting Smolen, 80 F.3d at 1290). According to the Commissioner's regulations, "an impairment is not severe if it does not significantly limit [the claimant's] physical ability to do basic work activities." Smolen, 80 F.3d at 1290. A severe impairment must have lasted or be expected to last for a

---

[5] To the extent Plaintiff contends that the ALJ erred in finding that Plaintiff's asthma was not severe, the claim similarly fails. The record clearly demonstrates that Plaintiff's asthma was well controlled. (AR 202, 277, 282, 288).

16

1  continuous period of not less than twelve months.   20 C.F.R. §§
2  404.1509, 416.909.

4      An impairment or combination of impairments can be found "not
5  severe" only if the evidence establishes a slight abnormality or a
6  combination of slight abnormalities which have "no more than a minimal
7  effect on an individual's ability to work."   SSR 85-28.   Only those
8  claimants with slight abnormalities that do not significantly limit any
9  "basic work activity" can be denied benefits at step two.   Bowen, 482
10  U.S. at 158).   If the evidence presented by the claimant presents more
11  than a "slight abnormality," the step two requirement of "severe" is
12  met, and the sequential evaluation process should continue.   Smolen, 80
13  F.3d at 1290.   "Reasonable doubts on severity are to be resolved in
14  favor of the claimant."   Newell v. Comm. of Social Security, 347 F.3d
15  541, 547 (3rd Cir. 2003).

17      The ALJ erred when he concluded that Plaintiff's headaches were not
18  severe.   (AR 10-16).   The extent and duration of Plaintiff's medical
19  treatment, including multiple MRIs, neurological tests, examinations and
20  a variety of treatment approaches (i.e., medications and Botox
21  injections), demonstrate that her headaches were on-going and
22  significant.   Plaintiff was admitted to the hospital for treatment of
23  her headaches on at least two occasions.   (AR 223, 215).   The medical
24  evidence demonstrates that Plaintiff consistently and regularly sought
25  treatment for her migraines from 2003 through 2006.   (AR 363, 200, 223,
26  229, 230, 214, 215).

27

28

17

Plaintiff's evidence regarding her headaches demonstrates more than a "slight abnormality."  Accordingly, it was error for the ALJ to find that her headaches were not severe at step two.  Remand is required to remedy this error.

## VIII.

### CONCLUSION

Because the Court finds that remand is required due to the step two error, the Court declines to reach the remaining issues raised by Plaintiff.  The Court notes that the ALJ appeared to rely, in part, on evidence in the record that Plaintiff was possibly employed during the period of alleged disability or that she was engaged in the unlawful sale of her narcotic prescriptions.  The degree to which the ALJ based his denial of benefits on these two facts was unclear from the ALJ's decision.  If the ALJ intends to rely on certain evidence to support his denial of benefits, then he must indicate which evidence he is relying upon (and the source and/or reliability of that evidence).

If Plaintiff was engaged in substantial gainful employment during the alleged period of disability, then the record should be developed on that issue.  Furthermore, the Court notes that there is ample evidence in the record that Plaintiff was prescribed narcotic medications.  The ALJ should determine whether or not side effects from those medications would have an impact on Plaintiff's ability to work. Finally, if the ALJ rejects the treating physician's opinions, the ALJ must provide clear and convincing reasons for rejecting those opinions.

18

1    Consistent with the foregoing, and pursuant to sentence four of 42

2    U.S.C. § 405(g),[6] IT IS ORDERED that judgment be entered REVERSING the

3    decision of the Commissioner and REMANDING this action for further

4    proceedings consistent with this decision.   IT IS FURTHER ORDERED that

5    the Clerk of the Court serve copies of this Order and the Judgment on

6    counsel for both parties.

7

8    DATED: October 20, 2009.

9                                              /S/

10                                    _____

11                                    SUZANNE H. SEGAL
                                      UNITED STATES MAGISTRATE JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26    ---
      [6]   This sentence provides: "The [district] court shall have power
27    to enter, upon the pleadings and transcript of the record, a judgment
      affirming, modifying, or reversing the decision of the Commissioner of
28    Social Security, with or without remanding the cause for a rehearing."